# In the United States Court of Federal Claims

No. 12-526C
(Originally Filed: November 27, 2012)
(Reissued: December 10, 2012)[1]

* * * * * * * * * * * * * * * * * * * * * *

SYSTEMS APPLICATION &
      TECHNOLOGIES, INC.,

               *Plaintiffs*,

v.

THE UNITED STATES,

               *Defendant,*

SKOOKUM EDUCATIONAL PROGRAMS,

               *Intervenor.*

Bid Protest; Ability One
Program; Severely
Disabled Workers

* * * * * * * * * * * * * * * * * * * * * *

    *Craig A. Holman* and *Dominique L. Casimir*, Washington, D.C., for plaintiff.
    *Shelley D. Weger*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for defendant.
    *Arnold M. Willig*, Seattle, W.A., for intervenor.

_____

## OPINION

_____

BRUGGINK, *Judge*.

_____

[1] Publication was deferred pending the parties' review for redaction of protected materials.  The parties agreed that no redactions were required.

Systems Application & Technologies, Inc. ("SA-TECH") is the incumbent contractor for the Army for "Operation and Maintenance of the Multipurpose Ranges and Facilities Services" at the Yakima Training Center ("YTC"), in western Washington state.  The YTC is used as a training area for large-scale military maneuvers involving heavy wheeled and tracked vehicles, including tanks and long-range weapons.  The Army contracts out the operation and maintenance of the facilities, infrastructure, and range equipment because it "does not have the work force or expertise to perform and deliver this service."  Administrative Record ("AR") 956.  The contractor conducts normal day-to-day operation of the ranges as well as the maintenance of remote controlled targets and associated equipment.  The contractor also provides management and maintenance for the Multi-Purpose Range Complex facilities and infrastructure in order to sustain the training mission.  AR 956.  The work includes maintaining the live fire range during training by replacing and repairing targets in order to maintain 100% operational readiness.  While the re-targeting and repair does not take place during live fire, it is hazardous work, in part, because of the risk of encountering unexploded ordinance and because the contractor is responsible for cleanup and disposal of any hazardous and toxic waste.  The site is in a remote desert area.  The closest hospital is 30 miles away.  There is no public transportation to the site.  All the current job descriptions require that employees be able to drive, lift up to 100 pounds, engage in strenuous physical exertion during stressful conditions, and be available 24 hours a day.

The Army proposes taking this work away from the incumbent, with whom it has no complaint, at the expiration of the contract in order to give the work to the intervenor, Skookum Educational Systems ("Skookum"), who promises to do the work using at least sixty percent severely disabled workers. Under the terms of the applicable statute, severely disabled workers cannot be otherwise competitively employable. 41 U.S.C. § 8501(8) (Supp. V 2012). Skookum has "zero" experience with this precise type of work.  AR 2525.

While to an outsider it would appear that what the Army proposes is sheer folly, the government has aggressively defended its actions as permissible under the Javits-Wagner-O'Day Act ("JWOD"), 41 U.S.C. §§ 8501-506.  That act authorized creation of the Committee for Purchase from People Who Are Blind or Severely Disabled (the "Committee" or "AbilityOne").  *Id.* § 8502; *see* Pub. L. No. 95-739, 52 Stat. 1196 (1938) ("That there is hereby created a Committee . . . to determine the fair market price of all brooms and mops and other suitable commodities manufactured for

2

the blind and offered for sale to the Federal Government . . . .").  The purpose of the Committee is to "increase employment and training opportunities for persons who are blind or have other severe disabilities." 41 C.F.R. § 51-1.1(a) (2012).  A "severely disabled" individual is the following:

> [A] person other than a blind person who has a severe physical or mental impairment (a residual limiting condition resulting from an injury, disease, or congenital defect) which so limits the person's functional capabilities (mobility, communication, self-care, self-direction, work tolerance, or work skills) that the individual is unable to engage in normal competitive employment over an extended period of time.

41 C.F.R. § 51-1.3.  The Committee is responsible for developing a "Procurement List" of products and services which are suitable for the Federal Government to procure from qualified nonprofit agencies ("NPA") which employ a workforce of blind or severely disabled individuals. 41 U.S.C. § 8503.

For a commodity or service to be suitable for addition to the Procurement List, each of the following criteria must be satisfied:

> (1) Employment potential.  The Proposed addition must demonstrate a potential to generate employment for persons who . . . have other severe disabilities.
> (2) Nonprofit agency qualifications.  The nonprofit agency (or agencies) proposing to furnish the item must qualify as a nonprofit agency serving persons who . . . have other severe disabilities . . . .
> (3) Capability.  The nonprofit agency (or agencies) desiring to furnish a . . . service under the JWOD program must satisfy the Committee as to the extent of the labor operations to be performed and that it will have the capability to meet Government quality standards and delivery schedules by the time it assumes responsibility for supplying the Government.
> (4) Level of impact on current contractor for the commodity or service.
>> (i) . . . whether or not a proposed addition to the Procurement List is likely to have a severe adverse

> impact on the current contractor for the specific
> commodity or service . . . .

41 C.F.R. § 51-2.4.

Once the Committee concludes that a product or service is suitable, it is added to the Procurement List and the agency is obligated to obtain that product or service from the AbilityOne approved NPA. 41 U.S.C. §§ 8503(a), 8504.[2] Here, the Committee, with the Army's concurrence, has designated the contract suitable for addition to the Procurement List and for award on a sole source basis to Skookum, an AbilityOne NPA.

Before us is a bid protest filed by SA-TECH, the incumbent contractor. During oral argument on November 16, 2012, the court granted a permanent injunction against placement of this contract on the Procurement List for AbilityOne contractors.  As we explained then, the injunction prevents Skookum from being awarded this contract on the basis of the current record. Our reasons for entering an injunction follow.

## BACKGROUND

SA-TECH was awarded the current contract for operation of the YTC on December 24, 2003, after full and open competition, and it has successfully performed.  AR 677, 956-57.  The contract was set to terminate on August 24, 2012, but SA-TECH is operating under an extension which will expire on November 30, 2012.  AR 2614.

The Army developed a Performance Work Statement in connection with renewing the contract for range services.  The statement describes the YTC as "a large, multi-mission military installation that includes state-of-the-art ranges . . . capable of supporting up to 15,000 troops daily."  AR 2640. YTC spans 327,000 acres of terrain that "is covered with sagebrush, volcanic formations, dry gulches, large rock outcroppings, and flat valleys." AR 2639-40.  The temperature at the YTC ranges in extremes from well below freezing in winter to 110°F in the summer.  AR 2640.  The winters produce an average

---

[2] This is an exception to the competition requirements of the Competition in Contracting Act, Pub. L. No. 98-369, 98 Stat. 1175 (1984) (codified as amended throughout Title 41 of the United States Code).

annual snowfall of 24 inches.  *Id.*  Forty-five percent of the contract price is devoted to range operations and thirty-five percent is set aside for facilities and road maintenance.  AR 2719.  The contractor will be responsible for preparing and installing targets for the ranges, configuring "targetry and device presentation in conformity with scenarios provided" and for the "efficient operation of the complex."  AR 3155.  Live ammunition and explosives are used at YTC in the course of training and, therefore, "quantities of dud and other potentially hazardous munitions may be found on all parts of YTC."  AR 2661.

The President of SA-TECH, Timothy Adams, testified before the Committee at a hearing in April 2012 that the purpose of training exercises on the ranges is to put stress on the soldiers, but the effect is stress on everyone, including the contract employees.  AR 2511.  He characterized it as "extremely hazardous high pressure work which if not performed properly poses significant risk to the employees and the troops they train."  AR 2502.  "The severely disabled cannot effectively or safely perform at the Yakima Training Center live firing range . . . ."  AR 2502.   He found it "hard to imagine people who are not extremely fit" being capable of doing the work.  AR 2511.  Also, each of his employees must be able to multitask, doing each others' jobs as necessary.  AR 2511.

With the current contract nearing its end, Mission and Installation Contracting Command ("MICC") through its Director of Contracting, Pamela Munoz, and Contract Administrator, Angela Chaplinski, began exploring the possibility of turning the work over to an NPA under the AbilityOne Program.  *See* AR 1013.  There is nothing in the record to indicate what triggered that consideration for the range services contract, although Army contracting entities were being encouraged to "look for more opportunities to contract with AbilityOne-participating nonprofit agencies."  AR 781.

Ms. Munoz contacted the National Institute for the Severely Handicapped ("NISH").  *See* AR 1023.  NISH is one of two "Central Nonprofit Agencies" tasked by the Committee with facilitating "distribution . . . of government products and services on the procurement list."  41 U.S.C. § 8503(c).[3]  In order to assess whether range operations at YTC were a viable

---

[3] NISH receives a percentage of the revenues from the contracts
(continued...)

project for NISH and to better determine whether "people with disabilities" could perform the work, Ms. Munoz, Ms. Chaplinski, and NISH's Executive Director for the Northwest Region visited the training center on September 16, 2010.  AR 1075, 1095-1104.  Shortly thereafter, MICC, NISH, and the command at YTC determined that this contract was a candidate for the Procurement List.  AR 956.

On October 4, 2010, the Committee sent SA-TECH's Mr. Geoff DeZavala a letter informing plaintiff that the Committee intended to consider adding the contract for live firing range operations at the YTC to the Procurement List.  The Committee asked SA-TECH to let the Committee know what impact losing the contract would have on the company.  The letter stated, "[T]he Committee will interpret your lack of response to indicate that you have determined that the level of impact on your firm would not be severe . . . ."  AR 104-05.  On October 21, 2010, the Committee sent another letter informing SA-TECH that its failure to respond was interpreted by the Committee as an admission that loss of the contract would not impact SA-TECH severely.  AR 108.  This letter also informed SA-TECH that it could submit a comment during the Committee's informal rule-making process.  AR 108-109.  SA-TECH did not respond, and on November 1, 2010, the Committee issued its "Impact Analysis" finding that SA-TECH would not be adversely affected by adding the contract to the Procurement List.  AR 111.

On October 8, 2010, NISH issued a "sources sought notice" for up to three potential NPA contractors to submit briefings to the Army concerning their capability to operate YTC.  AR 1113-15.  Skookum was the only NPA to respond with a proposal.  AR 1238.  Representatives from MICC, Skookum, and NISH visited the range and on December 10, 2010, presented a capabilities briefing to the Army.  AR 961.  The Army referred the contract to the Committee on December 30, 2010, in effect seeking a determination of whether to add the contract to the Procurement List.  AR 118.

Contemporaneous with this review, Jeffrey Dolven, the CEO of Skookum, emailed Ms. Munoz the following:

---

[3](...continued)
awarded to NPAs. 41 C.F.R. § 51-3.5.

> As we briefed on Friday, we plan to start the project with essentially the same crew now on the ground in Yakima. Over the next five years we will slowly integrate people with disabilities into the work force, focusing on finding people with the abilities to the get the job done. . . . I'd like to go one step further and offer the following guarantee in an effort to make the installation more comfortable with committing to the AbilityOne path. If we get into this project and find that we can't integrate people with disabilities into this environment, we'll work out a way to migrate the project out of the AbilityOne program and back into the realm of competitive procurement. What I mean is that if we get a year or so into this project and the folks we are placing into the workforce can't for some reason get the job done from the customer's perspective, Skookum will hire people without disabilities and will run the range using a more traditional workforce until the Government can move the project back into the realm of competitive procurement and find a more traditional vendor.

AR 821.

During the Committee's first assessment, SA-TECH submitted a letter to the Committee outlining why the contract should not be placed on the Procurement List. It explained that the range contract made up six percent percent of SA-TECH's total revenues and that the company's experience on the contract is a major marketing tool for other military work, meaning that loss of the contract would cause significant harm to the company.[4] AR 287.

Attempting to assuage concerns within the Army, Ms. Munoz emailed YTC Commander, Lieutenant Colonel Michael Daniels ("LTC Daniels"):

> It is my plan to start engaging Skookum in the development of this requirement so all can start getting more comfortable with this partnership and the skills Skookum brings to the table. I can

---

[4] During his oral presentation to the Committee on April 24, 2012, Timothy Adams, CEO of SA-TECH, stated that the contract represented ten percent of revenues. AR 2503.

> do this because this is not a competed requirement, which gives
> us more leeway for a collaborative effort.

AR 855.  Despite the statutory dictate that severely disabled individuals are, by definition, not commercially employable, she further passed along the following: "Skookum estimates that 10% of the current labor force may have conditions to meet the criteria for severely disabled . . . especially if they are vets.  Please remember the term 'significantly disabled' is very broad and frequently includes people some may be surprised would meet this criteria." AR 856.

NISH submitted an assessment package to the Committee putting forward Skookum's proposal on May 12, 2011.  AR 118.  In that line in the submission form at which NISH was to do an assessment of Skookum's capability to do the work, the following appears:

> Waived.  Skookum is a capable NPA for this project.  Skookum
> has experience in Total Facilities Maintenance with current
> AbilityOne/DOD projects.  Many of their staff have professional
> experience with Range Control and experience with many of the
> areas in the [Statement of Work].   Skookum also currently
> manages 3 large technical service contracts at JBLM, CIF, Fleet
> and janitorial very successfully.

AR 121.

On July 18, 2011, the Committee voted to approve adding the contract to the Procurement List.  AR 268-69.  Because adding a service to the list involves informal rule-making, the Committee published a notice in the Federal Register on July 22, 2011, proposing to add the range operation contract.[5]   AR 937-38.  The Committee officially added the contract for operation of the YTC to the Procurement List on July 26, 2011.

---

[5] The notice referred to the contract as one for "facilities maintenance," rather than for operation and maintenance of the ranges, although the work to be performed did not change.  Facilities maintenance was, however, an area with which Skookum had prior experience.

Thereafter, on August 25, 2011, LTC Daniels obtained a memo with the following concerns:

> The stringent requirements under the contract to conform to all OSHA regulations, all explosive ordnance directives and to operate safely in a highly dangerous work environment could be compromised by a severely disabled workforce. Severely disabled individuals most likely would have issues with the following skills and requirements in the Contract:
>
> a. 24/7/365 Work schedule in all types of weather (rain, snow, cold, etc.)
> b. No notice call back to work, at all hours.
> c. High physical labor requirements (must be able to lift up to but not to exceed 100 lbs)
> d. Work in a high pressure, dangerous, live fire range environment
> e. Work with high voltage electricity
> f. Operate heavy equipment (road graders, backhoes, dump trucks)
> g. The majority of the job positions have the skill set requirement of the physical dexterity to push/pull, climb/balance, bend/stoop, twist/turn, kneel/crouch, crawl, reach overhead, grasp, use feet for foot controls in order to perform ones job duties.

AR 2205. We do not know who originally wrote this memo, but it was part of the record made available to the Committee. The apparent source of the memo, however, was George Holman, the civilian Range Officer working for the Army at YTC, but the paper might have originated on an SA-TECH computer. AR 2203-211.

In response to the Committee's decision to add the contract to the Procurement List, SA-TECH initially filed suit here on August 26, 2011. AR 1675. On November 10, 2011, the Committee volunteered to reevaluate its action to add the contract to the Procurement List, AR 1676, and plaintiff voluntarily dismissed that first protest.

In the course of making its reevaluation, the Committee sought more information from SA-TECH and Skookum. AR 1892. On January 25, 2012,

9

SA-TECH submitted a packet of information further detailing how SA-TECH would be harmed by the addition of the contract to the Procurement List and why, in its view, the services covered by the contract cannot be performed by the severely disabled.  AR 1892, 1897.

Also on January 25, 2012, employees of MICC met with Mr. Lou Bartalot, AbilityOne's Director of Compliance, to discuss the reevaluation process and the need to create an administrative record.  AR 3183.  The group discussed whether to do a pre-award survey assessing the NPA contractor's potential to do the work.  AR 3184.  Applicable regulations provide that the "Committee may request a contracting office to assist in assessing the capabilities of a nonprofit agency."  48 C.F.R. § 9.107(a) (2012).  The contracting office may then produce a capability survey or "notify the Committee that the AbilityOne participating nonprofit agency is capable, with supporting rationale, and that the survey is waived."  48 C.F.R. § 9.107(b).  While the group noted that the capability survey previously had been waived, the group concluded that "there is no value added to the process by doing the survey."  AR 3184.

The following day, Mr. Bartalot attended another group meeting in which Army personnel asked him to explain what it meant to be severely handicapped.  AR 3190.  "Mr. Bartalot explained that to AbilityOne severely handicapped meant a person with functional limitations that made them not commercially employable."  AR 3183.

After attending this meeting with Mr. Bartalot and receiving Skookum's Technical Proposal, LTC Daniels delivered a memorandum for the record describing his reservations about adding the contract to the Procurement List. AR 1882, 3192.  Specifically, he stated, "we still harbor reservations about any NISH / AbilityOne contractor being able to successfully meet all the contract requirements . . . ."  AR 3192.  He remained "uncomfortable with the vetting and definition of 'significantly disabled' and how that impacts the labor force of the contract," expressed "concern[] about the definition of a disabled worke[r], and the potential hiring pool in the area," and he doubted whether "having a labor force that has severe mental and physical disabilities, monitored by non-medical supervisors / work leads, and working in what can be a harsh and stressful environment, will produce a positive outcome."  *Id*. LTC Daniels went on to say, "[w]e were originally led to believe that disabled veterans, some employed by the incumbent contractor, would meet AbilityOne's definitions and remain employed after vetting, counting towards

the final goal." *Id*.  Although LTC Daniels was not confident in the outcome, he "hesitantly agreed to proceed." *Id*.

In lieu of the pre-award capability survey contemplated by regulation, MICC issued a "Determination and Findings" for the YTC contract on April 19, 2012.  AR 3298, 3306.  After discussing Skookum's financial capability, human resources, quality control and safety, and technical capacity, MICC certified that Skookum was capable of performing the work even though "Skookum currently does not have . . . direct experience in providing range operations and maintenance of the targets." AR 3298-3306.  With respect to Skookum's Technical Capacity to do the work, the Determination and Findings concluded the following:

> Some portions of the required services have not been performed by Skookum, so no information can be provided to further [the contracting office]'s knowledge in those areas and in the areas where Skookum is already providing these services. The [contracting office] has sufficient information internally to satisfy its knowledge of Skookum's technical capacity and capability.

AR 3299.  In other words, the fact that Skookum lacked relevant direct experience apparently was a reason, at least in MICC's view, not to do a more detailed capability assessment.  Instead, MICC was satisfied based on Skookum's general record of performance on other AbilityOne contracts.  It is not clear from the record what the basis was for the internal information that satisfied MICC.

On July 6, 2012, the AbilityOne Committee issued a reevaluation letter to its members that called for a vote regarding the prior decision to place the YTC contract on the Procurement List.  AR 1664.  This letter recommended that the Committee vote to approve adding the contract to the Procurement List with the understanding that it would be performed by Skookum.  AR 1673. Along with the vote letter, the members of the Committee received the Committee Staff's Executive Summary, a draft of the performance work statement, Skookum's proposal, SA-TECH's submission outlining its concerns, a letter describing the Army's concerns, MICC's Determination and Findings, and other supporting documents.  AR 1675-2489 *passim*.

11

The Committee held an Executive Session on April 24, 2012, at which representatives of SA-TECH and Skookum were permitted to make presentations.  AR 2490.  During the session, committee member Kathy Martinez told plaintiff's counsel,

> I am very concerned about your concept of what a significant disability means and what people with significant disabilities can do?  I happen to be a blind person.  I don't work on a shooting range, but I am you know, a significant, I am a person with a significant disability who is employed.  And, I am unaware that the term significant disability means that you can't hold down a job.

AR 2508.  After plaintiff's counsel read the statutory definition of "severely disabled," Ms. Martinez replied, "I think that's a very antiquated definition frankly."  *Id*.

On July 20, 2012, the Committee again voted to add the YTC contract to the Procurement List.  Nine members voted in favor, one was undecided, and three disapproved.  AR 2566.  The three dissenting members of the Committee expressed doubts as to the propriety of awarding this contract through AbilityOne.  They were concerned because the principal behind the incumbent contractor was a disabled person who employed service disabled and other veterans, the work did not seem safe for severely disabled individuals,  Skookum was allowed a long phase in period and a low goal for the percentage of severely disabled individuals employed, and Skookum had not presented a plan for transporting severely disabled individuals 33 miles to and from YTC.  *See* AR 2567.

After the Committee voted to keep the contract on the Procurement List, MICC made what it characterized  as "massive changes" to the solicitation.  AR 3181-82.  The Committee did not subsequently reevaluate whether to add the contract to the Procurement List.

In response to the Committee's second vote to add the contract to the Procurement List, SA-TECH filed the present bid protest on August 20, 2012.  Currently before the court are the parties' cross-motions for judgment on the administrative record.  As we announced at the end of oral argument, and for the reasons explained below, we grant plaintiff's motion for judgment on the administrative record and we deny defendant's cross-motion for judgment on

the administrative record.  We enjoin placement of this contract on the Procurement List for AbilityOne contractors.

## DISCUSSION

Pursuant to the Tucker Act, this court has jurisdiction to render judgment on an action by an "interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (2006).  SA-TECH is an "interested party" because, as the satisfactorily performing incumbent, SA-TECH is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract."  *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).  SA-TECH  asserts that the Committee violated 41 U.S.C. § 8501(6) (Supp. V 2012) by applying the statutorily required 75% ratio of severely disabled workers to the NPA as a whole rather than to each contract.  In the alternative it argues that the Committee acted in an arbitrary and capricious manner by adding the contract to the Procurement List without satisfying the suitability determination requirements set out in 41 C.F.R. § 51-2.4 (2012).  "As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction." *RAMCOR Serv. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999).  *See also Angelica Textile Serv., Inc. v. United States*, 95 Fed. Cl. 208, 215-18 (2010) (finding that the Court of Federal Claims has jurisdiction to hear protests regarding AbilityOne's decision to add a service to the Procurement List and, if warranted, to grant an appropriate remedy).  Because SA-TECH is an interested party alleging a violation of law in connection with a procurement, we have jurisdiction.

The standard of review we enforce in bid protests is borrowed from the Administrative Procedures Act.  *See* 28 U.S.C. § 1491(b)(4) (2006).  The Committee's actions, findings, and conclusions are thus reviewed to determine if they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A) (2006).

The Committee used informal rule-making to add the operations and facilities maintenance services at the YTC to the Procurement List.  The measuring stick for the Committee's action is its own regulations which describe the suitability determination that the Committee must make before adding a product or service to the Procurement List.  41 C.F.R. § 51-2.4.

Thus, when comparing the Committee's action in this case to the regulation that describes the requirements of a suitability determination, the court will consider: "(1) whether the rulemaking record supports whatever factual conclusions underlie the rule; (2) whether the policy determinations behind the rule are rational; and (3) whether the agency has adequately explained the basis for its conclusion." *McGregor Printing Corp. v. Kemp*, 20 F.3d 1188, 1194 (D.C. Cir. 1994); *see Mortg. Investors Corp. of Ohio v. Gober*, 200 F.3d 1375, 1378 (Fed. Cir. 2000).

SA-Tech's primary legal argument is that the Committee failed to enforce what it contends is a statutory requirement that 75% of the direct labor on the contract be performed by the severely disabled.   It relies on the definition of a qualified agency, which is an entity:

> (C) that in the production of products and in the provision of services (whether or not the products or services are procured under this chapter) during the fiscal year employs blind or other severely disabled individuals for at least 75 percent of the hours of direct labor required for the production or provision of the products or services.

41 U.S.C. § 8501(6) (Supp. V 2012).   The Committee takes the view, as expressed in its regulations, 41 C.F.R. § 51-1.3; AR 373, that the 75% requirement applies to the entire labor force of a qualified entity, not necessarily the force used on any one contract.   In this case, the Committee proposed to let Skookum build up to a 60% severely disabled workforce by the end of three years.   It was satisfied that Skookum's overall workforce still would exceed 75% severely disabled.

It is unnecessary for us to resolve this dispute.   We conclude for reasons set out below that the Committee acted in an arbitrary and capricious way in placing the YTC contract on the Procurement List, irrespective of whether it erred in not requiring Skookum to reach the 75% severely disabled level for the YTC contract.

Plaintiff contends that the agency did not perform a proper suitability assessment pursuant to section 8503(a) of the JWOD Act and its implementing regulations.  Under those regulations, the record must demonstrate four things: 1) that putting the contract on the Procurement List  has the potential to create jobs for the severely disabled, 2) that Skookum was a qualified entity, 3) that, at the time Skookum would begin doing the work, it had the capability to meet Government quality standards and delivery schedules, and 4) that the

Committee evaluated whether taking the contract away from SA-TECH would have an adverse impact on the incumbent. 41 C.F.R. § 51-2.4. Plaintiff argues that none of the four criteria were satisfied, but we will limit ourselves to two: whether the record demonstrates that putting the contract on the Procurement List had the potential to create jobs for the severely disabled and whether Skookum had the capability to meet Government quality standards and delivery schedules. The two questions are related.

The Committee required Skookum to commit to using 60% severely disabled for its direct labor. This meant that at least 20 out of the 30 direct labor employees would be severely disabled. Plaintiff contends that the record does not show either that there was a meaningful prospect of employing anywhere near that number of severely disabled or, if that number were achieved, that severely disabled employees could do the work.

There are a number of contraindications with respect to the likelihood of creating jobs for the severely disabled. First, there is the difficulty of finding a sufficient number of qualified but severely disabled individuals within commuting distance of the ranges. The contracting officer refers to a "dearth" of such persons in the Yakima area and the unwillingness of persons to relocate to Yakima from the Puget Sound area. AR 856. Committee staff cautioned,

> The selection of the people with severe disabilities for this particular AbilityOne project will require more rigorous recruiting and training than most other AbilityOne projects. In particular, the need for physical dexterity and mental faculties will reduce the pool of individuals that also meet the Commission's definition of severely disabled.

AR 1685.

Skookum proposed starting on day one of the contract with nine severely disabled persons. When Skookum was asked about how it would locate such persons, it referred merely to statistics about the "disabled" in the Yakima area. One of the Committee members pointed out that this data could not be relied on with respect to the severely disabled, and referred to Skookum's figures as a marketing pitch. AR 2528.

None of these nine initial employees were identified by name, by capability, or by disability. Despite the unusually rigorous physical demands of the job, Skookum made no effort to match the requirements of particular

15

jobs with particular disabilities and offered only the vaguest generalities. *See* AR 2522 ("[T]ypically, we don't find a match between the AbilityOne definition and the VA definition before you start getting into the 60-70% range. And, even then it's a case-by-case. But, there are folks out there who will qualify."); AR 3265 ("We are confident that over the period of 36 months we will obtain the necessary workers . . . .").

When asked to propose an individual currently working for Skookum who might be able to do the work, Mr. Dolven referred to an employee at the White Sands Missile Range who suffers from acoustic neuroma, bells palsy and has hearing loss. One of the Committee members pointed out, however, that an acoustic neuroma can be benign and that Skookum could "be challenged in regard to whether that individual could be one of the most significant disabled persons." AR 2523. Equally problematic, however, was that the individual had balance problems and thus could not climb. He was also hearing impaired. Given this particular example, the Committee should have posed the question how someone who cannot climb and has hearing problems could function on the Yakima ranges.

In a memorandum to Committee members, staff suggested that work being performed elsewhere by Skookum with the severely handicapped was comparable to that required at Yakima. They noted that:

> Maintenance trade helpers and laborers are among the positions filled by people with severe disabilities doing the range maintenance work at those locations. The people with severe disabilities employed at White Sands and Fort Bliss have a number of disabilities including major depressive disorder, post-traumatic stress disorder (PTSD) with depressive and anxiety disorder, degenerative joint disease, deafness, polio, borderline intellectual functioning, bipolar and learning disabilities.

AR 1686.

It is uncontroverted that the YTC contract is not the same as the work Skookum does at Fort Bliss and White Sands. Describing the YTC contract as merely "facilities maintenance" makes it sound more like other AbilityOne work, but that description is inaccurate. Conditions on the range are stress-inducing, according to Mr. Adams, and involve the explosion of munitions during live fire. An unavoidable question should have been, is it appropriate to put someone who has severe post-traumatic stress disorder with depressive

and anxiety disorder on or even near a live fire range.  Or, can someone who has degenerative joint disease or polio meet the physical requirements of the job:  "Requires ability to lift and carry boxes and packages not to exceed 100lbs.   Requires the physical dexterity to push/pull, climb/balance, bend/stoop, twist/turn, kneel/crouch, crawl, reach overhead, grasp, [and] use feet for foot controls."  AR 2010 (describing the job of a Maintenance Trades Helper).

Instead of asking such questions, the Committee staff shifted the burden to SA-TECH and relied on high-minded policy:

> The list supplied by SA-TECH contains factual statements of the contract requirements, but they are not factual evidence that individuals with severe disabilities are inherently incapable of performing the required tasks safely.  Moreover, it should not be assumed that Skookum will perform the work in the same way that SA-TECH has in the past.

> As the Committee is well aware, throughout history, there are many notable congressional actions that have become law, including the JWOD Act, to dispel the attitude that people with disabilities 'cannot do that.'  The JWOD Act recognizes that, in the performance of federal contracts, people with disabilities are hired for what they 'can do.' . . . In reviewing the list of performance and safety concerns noted, SA-TECH simply wants the reader to accept their unsupported claims that people with severe disabilities cannot perform the functions.

AR 1685.  It was not SA-TECH's burden to show that severely disabled are "inherently incapable" of performing any of the tasks on the YTC contract.  It was Skookum's burden, given the numerous reasons for concern, to show that there were a sufficient number of specific jobs that could be done by severely disabled workers.  Instead of thinking critically about whether severely disabled individuals are capable of performing the contract, the Committee criticized SA-TECH for assuming "that Skookum will perform the work in the same way that SA-TECH has in the past," and uncritically accepted Skookum's unsupported claim that doing the work in some unspecified

different way somehow solves the technical problems posed by the YTC contract.[6]

Skookum's confidence in the face of the unique tasks could be attributable to optimism.   Alternatively, the Committee had reason to be concerned that Skookum would accomplish the job without really making use of the severely disabled.   Initially Skookum told Ms. Munoz that it expected to do the work by hiring all of SA-TECH's existing employees. AR 821, 1263 ("[W]e plan to start the project with essentially the same crew now on the ground in Yakima.").   That is consistent with its history on another contract: "In October 2008, we took over Base Operating Services for the Acoustic Research Detachment, and similarly were able to retain the previous direct labor work force and provide superior quality to the Navy."  AR 976.

When asked by one of the Committee members to answer a charge by SA-TECH that Skookum planned to simply re-employ its workforce, Mr. Dolven gave the following response:

> Jim Omvig: This is Jim Omvig.  I am trying to decide if I should ask this.  It has been suggested that you might try to count several people who were on their workforce and classify them as severely disabled even though they know, or even though you know, they do not really meet the significant disability definition here.

> Jeff Dolven: Scurrilous accusations. (laughter)  I don't know what to say to that.  What we are trying to do is to express our intent which we'd go in and talk to the incumbent workforce, you know.  We haven't talked to these folks.  We're not exactly on speaking terms, but we need to first seek to understand, right. So Jim, what we are trying to say is that we are going to go in, talk to them you know, their president said I have veterans with disabilities, okay let's talk to them.  I am skeptical and was

---

[6] Skookum's CEO made reference in his oral presentation to job splitting and making use of part-time workers as forms of accommodation, but did not explain how that would overcome the fundamental challenges of finding people who could drive, lift "packages not to exceed 100lbs," and have "the physical dexterity to push/pull, climb/balance, bend/stoop, twist/turn, kneel/crouch, crawl, reach overhead, grasp, [and] use feet for foot controls." AR 2010, 2517.

skeptical at the time that they would have a definite...you know, severe enough disability to count.  But, you know I don't want to categorically say no.  But, that's not typically what we find. If you find someone who is working for a large company then almost by definition they're employable unless there's some accommodations in place that are being made, and that happens. There are companies that have a social conscience to do this kind of stuff.  But, out of ignorance I am not going to categorically deny them the opportunity; to talk to our HR folks.

AR 2525-27.

Mr. Dolven, in short, did not disavow that his plan to begin with nine severely disabled employees involved the hope that Skookum might be able to reclassify SA-TECH's existing employees.  That was consistent with Ms. Munoz' understanding that "Skookum estimates that 10% of the current labor force may have conditions to meet the criteria for severely disabled . . . especially if they are vets."  AR 856.  This should have triggered a concern that the incumbent would be ousted on the basis of improperly reclassifying persons who were disabled, but not unemployed, or that Skookum did not have a feasible plan for hiring the severely disabled.

It should have been readily apparent to the Committee and MICC that there was an inherent contradiction built into Skookum's proposal.  To the extent Skookum's capability to the do the work with a significant number of severely disabled individuals was questioned, it retreated to assurances which undercut the likelihood that the contract had the potential to create jobs for the severely disabled:  Skookum would initially hire all of the incumbent employees[7] (by definition, none could be severely disabled),[8] it would only attempt to achieve a 60% level of severely disabled instead of the typical 75%,

---

[7] *See* AR 1497 ("If anything . . . with Skookum's position to retain current contract staff during an extended phase-in, you will have more stability of contractor workforce and contract support than you would through a competed endeavor in which you would not have this guarantee.").

[8] An individual is not "severely disabled" if he or she "is able to engage in normal competitive employment because the impairment has been overcome or the condition has been substantially corrected."  41 C.F.R. § 51-1.3(2).

and it would not attempt to achieve that until the end of three years of performance, instead of the usual 90 day phase-in.

What should have been equally disturbing was Skookum's ultimate guarantee that if it couldn't do the work, it would abandon the effort to achieve even 60% and simply use able-bodied workers. While these assurances might be relevant to meeting the capability requirement, they are obviously at odds with the statutory expectation that a meaningful number of jobs could be created for the severely disabled. Skookum's efforts to straddle both requirements created a built-in tension in its proposal. It was MICC's and the Committee's obligation to identify that tension and resolve it, not to ignore it and in effect turn the procurement into an experiment.[9]

Based on this record, we cannot defer to the conclusion by the MICC and the Committee[10] that there was a potential for creating jobs for the severely disabled. It is of particular concern to the court that the individual at the Army whose responsibility it was to protect the Army's interests showed an inclination to accept creative applications of the term "severely disabled," AR 856, 1509, and seemed more eager to promote AbilityOne in general and Skookum in particular than to address the serious misgivings being raised. In addition, some Committee members seemed hostile to statutory limitations on the term "severely disabled," AR 2508 ("I think that's a very antiquated definition frankly."), and the terms "disabled" and "severely disabled" are used interchangeably throughout the record as if there were no distinction. *Compare* AR 1885 *with* AR 1669.[11]

––––––––––––––––––––

[9] *See* AR 363 (Statement of Committee member explaining approval vote: "I am concerned about what appears to be an exceptionally long phase-in period for this contract. I believe the Committee should monitor this contract on a yearly basis to determine if the workers are available to support this contract.").

[10] We recognize that some members on the Committee asked serious questions (without receiving serious answers) and some voted against giving the contract to Skookum. Of necessity we must refer to the action of the Committee as a whole.

[11]     Jim Omvig: Would you intend to hire some of he employees who are working on the project right now?

(continued...)

These same factors raise questions about the second criteria, namely, whether Skookum, assuming it could find a sufficient number of severely disabled people located near Yakima, would have the capability to do the work. Army personnel responsible for successful operation of the YTC expressed "reservations about any . . . AbilityOne contractor being able to successfully meet all the contract requirements, and . . . [remained] very concerned about a potential gap in range maintenance coverage should this . . . option fail." AR 1882. In the court's view, those concerns were never meaningfully addressed.

Despite the fact that this was to be "the first Range Operations Services in the AbilityOne Program," AR 118; *see* AR 3220-23, MICC waived any assessment to determine if Skookum had the capability to perform the work. Later, in doing their corrective action after the first protest, Committee staff met with representatives of MICC and concluded that "there is no value added to the process by doing the survey." AR 3184. The attendees of a meeting between MICC and Mr. Bartalot, who was representing AbilityOne, recognized that this was somewhat unusual, but stated, "Mr. Bartalot told us that Skookum was preparing a Capability Report to document its business development plan and how it plans to execute this service. Skookum will provide this office a copy when it is done. Expected NLT 03 February 2012." AR 3184. Skookum, in short, was to do its own capability assessment.

Skookum indeed submitted a lengthy and detailed proposal for performing the YTC contract, concluding that it "does not see significant issues with routinely operating in any of the requirements at the YTC under any of the conditions listed." AR 3238. The 100-page proposal would be reassuring if it were submitted in connection with any typical commercial competition. Skookum's proposal thoroughly addresses its organizational structure, both generally and the one proposed for the YTC, details its experience on prior and other current contracts, outlines the nature of the work

---

[11](...continued)
> Jeff Dolven: Absolutely. Absolutely. . . . So, what I would intend to do at Skookum is go in, integrate on day-one nine people with disabilities into the existing workforce letting nine folks from the incumbent workforce go.

AR 2525-26.

required and its intent to perform that work, provides the resumes of the extensive experience of its permanent (presumably not severely disabled) staff, and details its experience in working with the disabled. This is not a typical commercial competition, however. In addition to the normal assurances that have to be given, Skookum had to do at least two other things: show that the contract has the potential for putting severely disabled persons to work and demonstrate that it has the capability of doing the work while using that workforce. The term "severely disabled" does not appear once in connection with the YTC work.[12] Most critically, Skookum makes no attempt to explain how particular direct labor positions or tasks at the ranges could be done by the severely disabled.

This omission was observed by LTC Daniels: "We are still very uncomfortable with the definition of 'severely disabled' and how that impacts the labor force of the contractor. . . . [O]ur very experienced range staff strongly doubts that having a labor force that has severe mental and physical disabilities . . . working in what can be a harsh and stressful environment, will produce a positive outcome." AR 1882. Instead of taking these concerns seriously, Linda Murphy, the contracting officer at the time of the reassessment, wrote that "I feel it would not be appropriate at this juncture for the Army to actively participate further in the Commission's listing decision beyond what I have already stated in my determinations and findings issued in response to the proposal by Skookum." AR 3297.

Skookum's proposal also demonstrates the same lack of differentiation between disabled and severely disabled employees which marks other parts of the record. *See* AR 3300 ("Skookum's intent is to have at least 60% of the direct labor workforce comprised of people with disabilities by the end of its three (3) year phase-in period."); AR 3300-301 ("Research shows that in Yakima County alone, there is a disabled employee labor pool of approximately 6,138 people."). This distinction is a critical assumption behind the JWOD Act. *See* 41 U.S.C. § 8501(8).

MICC's Determination and Findings relied on Skookum's proposal as a substitute for its own capability determination. MICC concluded that "Skookum's vocational rehabilitation HR personnel have extensive experience with integrating people with disabilities into *jobs that are virtually identical*

---

[12] The term appears twice elsewhere in Skookum's proposal. Once by reference to the Committee and again in a resume of one of its employees.

to those at the MPRC" and that "Skookum is familiar with and *experienced in working around live fire ranges* and has a perfect safety record at WSMR [White Sands Missile Range]. Skookum's function at WEMR [sic] is base-wide Public Works." AR 3301 (emphasis added). The support for this statement is then detailed:

2. Operations on a Live-Fire Range

Skookum performs grounds maintenance work around the magazines for the Naval Trident Submarine Fleet at NBK Bangor, which indicates an awareness of and ability to operate in a potentially dangerous environment. Skookum has evaluated the skill sets and the knowledge base required to support the operation of a live-fire training range and compared that information against its core competencies in other Government contracts in developing its service delivery plan.

Skookum currently does not have the direct experience in providing range operations and maintenance of the targets; however, it is a member of the AbilityOne Network of over 600 Non-Profit companies providing services to the US Government. As part of this network, Skookum is able to reach back to other AbilityOne Providers who may have experience in these areas, if required. Information on two of these companies is provided below.

a. Pride Industries, an AbilityOne Network Provider, is currently performing base operations services at Fort Polk, LA, many aspects of which are alike or similar in nature to the services to be performed at YTC by Skookum.

The work includes road/tank trail maintenance and upkeep, snow removal, facility and ground maintenance.

b. Tresco, another AbilityOne Network Provider, is currently performing base operations services at Fort Polk, LA, and general support services associated with the operation of the High Energy Laser Systems Test Facility (HELSTF), located at White Sand Missile Range (WSMR) in New Mexico. Skookum provides the facilities maintenance and repair at WSMR. Tresco provides metal working support for maintenance, repair, and modification of equipment and components for the HELSTF,

23

including test support areas, test cell areas, laser device support systems, high-energy laser sites, and support facilities. Key expertise provided by Tresco includes, certified HVAC Technicians, licensed Electricians, certified Mobile Crane Operators, Heavy Equipment Operators, and Precision Machinists.

AR 3303.

A number of things stand out about this explanation. First, none of the experience cited is actual experience working "around" a live fire range. As Mr. Dolven pointed out at the oral presentation to the Committee, White Sands is a missile range, and therefore not comparable to YTC. AR 2525. Moreover, Skookum's activity at White Sands is not maintenance of range targets. It is facilities maintenance more generally.

Second, although "Skookum currently does not have the direct experience in providing range operations and maintenance of the targets," AR 3303, MICC seemed to think it is relevant that there is a network of over 600 other AbilityOne contractors who are "providing services to the US government." *Id.* None of those services, however, could possibly be operation and maintenance of a live fire range, as the YTC contract would be the first for an AbilityOne contractor.

Third, MICC was satisfied that Skookum could "reach back" to other AbilityOne providers who have experience in "these areas." AR 3303. It is less than clear what "reaching back" involves, or of what "these areas" consist. The reference to the work of Pride Industries and Tresco is notably lacking in operation and maintenance of a live fire range. Plainly the experience of other entities who would assume no contract obligations to the Army, particularly when that unspecified experience cannot possibly involve the precise work involved, is irrelevant to whether Skookum can do the contract work.

Skookum proposed assigning four job positions to the severely disabled: maintenance trade helpers, laborers, one electronic technician and one truck driver. Apparently recognizing that the current position descriptions require substantial physical prowess and dexterity, the Determinations and Findings makes the following statement under the heading, "Employee ability to lift Heavy Objects":

When there is a position requirement of physical dexterity to push/pull, climb/balance, bend/stoop, twist/turn, kneel/crouch,

24

crawl, reach, or grasp to perform specific job duties, Skookum
intends to closely match employees to the required needs.

AR 1889.  *All* the current position descriptions currently require employees to
be able to perform those tasks, *and* lift up to 100 pounds, *and* drive.  *See* AR
2000-22.  It was arbitrary and capricious to suggest that the solution to this
fundamental dilemma of matching the onerous physical work of this contract
with the severely disabled was the non-answer that "Skookum intends to
closely match employees to the required needs."  This was mere blue smoke
and mirrors and suggests that the Committee and MICC simply deferred to
Skookum to decide whether it could do the work.

The possibility that Skookum was operating under a misunderstanding
about the work also should have been apparent to MICC and the Committee.
Part of Skookum's response to concerns about the ability of the severely
disabled to do the work was to minimize the amount of work directly
connected to maintaining the live fire ranges, as opposed to general facilities
maintenance.  When asked how many people would need to be on the ranges,
Mr. Dolven responded: "[W]hen the ranges are totally hot, we might have six
folks who are involved in that effort, and there are thirty direct labor on the
project.  So, six out of thirty, leaving twenty-four folks engaged in other
activities, so roughly 20%."  AR 2515.  When Geoff DeZavala, Vice President
of SA-TECH was asked the same question, however, he responded:

Of the 36 that we have right now, we have one electrician, a
[Quality Assurance] guy, a project manager, and then everybody
else is working on the range supporting the targetry devices or
improving the roads. . . . So, really only three to four of our
folks are not actually down range working on the targetry.

AR 2512.  Mr. DeZavala's response could have been readily verified by Army
personnel, yet the Committee never challenged Skookum on this obvious
contradiction to a critical assumption behind the company's proposal.

Another glaring omission in the Committee's analysis of Skookum's
proposal is its failure to deal with the obvious problem of transportation for the
severely handicapped to a remote location.   The Committee had been told by
its staff that "[A]ll employees would need to be able to drive."  AR 3184,
3190.  They knew from Geoff DeZavala that "[M]ost of [the workforce] live
in the town of Yakima, which is about twenty miles on the interstate to what
we call exit eleven.  At exit eleven you enter a gate and it's a thirteen mile dirt
road ride up to the hill where the operation center is."  AR 2510.  They knew

that range employees would have to be available 24/7.  They knew there was no public transportation available.

What was Mr. Dolven's response?  He conceded "that is a challenge we can and will overcome, but there are over 7,000 people with disabilities according to the census that are in that area.  We need 20 or so." AR 2519.  Later, in response to continuing concern about transportation, he states:

> One of the things that makes this project challenging, there is no public transportation.  So, we will employ carpooling to the maximum extent possible, and we may look at providing some transportation of our own.  Vanpool . . . .  We've done these things in the past to conquer that issue.  This project is challenging.  It's going to add to the challenge of how we recruit people with the right abilities and who have skills like drivers.

AR 2524.  At this point the Committee should have realized that Skookum was offering only a promissory note, with no collateral.  As it suggested early on in the process, "if we get a year or so into this project and the folks we are placing into the workforce can't for some reason get the job done from the customer's perspective, Skookum will hire people without disabilities and will run the range using a more traditional workforce . . . ." AR 821.

Although the Committee has, by statute, the last word on setting aside contracts for AbilityOne contractors, Congress plainly assumed that the contracting agency would be something of a counter-weight, providing a reality check to ensure that critical work can actually be done by the severely disabled.  The reason the record does not demonstrate that placement of this contract on the Procurement List  has the potential to provide employment to the severely disabled, or that Skookum had the capability to meet Government quality standards is that MICC did not provide that counter-weight.  Instead, it became an advocate for AbilityOne in general and Skookum in particular.

In a challenge brought to another AbilityOne set aside, the District of Columbia Circuit Court made the following observation:

> The questions McGregor raised are questions of fact:  are blind workers capable of performing the jobs needed to produce this particular product?  The questions cannot be answered merely by pointing to the general experience of NIB and the workshops.  There is nothing in the record to support the Committee's apparent conclusion that blind people could do the work . . . .

26

> [I]f the workshops have no experience in producing a particular commodity, the Committee cannot—in the face of serious questions raised by an experienced manufacturer—simply fall back on NIB's general experience with blind workers.

*McGregor Printing Corp. v. Kemp*, 20 F.3d 1188, 1195 (D.C. Cir. 1994). This is precisely what occurred in the present case. MICC did not provide meaningful answers to the serious questions raised by other Army personnel. It merely accepted Skookum's *ipse dixit* that it could do the work,[13] and in the process undermined the intent of the AbilityOne program by giving Skookum a three year pass on its obligation to employ the severely disabled.

On the basis of the existing record, it was arbitrary and capricious for the AbilityOne Committee to designate the YTC for placement on the Procurement List. Because Skookum was the only contractor being considered, that means that its designation as the contractor for the work was also arbitrary and capricious. Plaintiff therefore succeeds on the merits.

SA-TECH would be permanently injured if an injunction is not issued. It has successfully performed the contract for seven years. The contract represents a significant portion of SA-TECH's revenues. AR 2503. Plaintiff began as a Small Business Section 8A minority and disabled-owned contractor. This is the first unrestricted contract that SA-TECH has won as a graduate of Section 8A and is key to marketing the company. AR 2501 ("If we lose this contract then we lose the longest unrestricted contract [we have] and the key points [of] our marketing for the company.").

The harm to plaintiff outweighs any potential harm to the government. The current contracting officer submitted a declaration outlining the affect on the Army of enjoining award to Skookum. In substance what the contracting officer reports is that it will take time to prepare for a commercial solicitation and it will add expense, primarily in terms of overtime or the potentially higher cost of a bridge contract.[14] These are routine and minor consequences. They

---

[13] "Over the next five years we will slowly integrate people with disabilities into the work force, focusing on finding people with the abilities to get the job done." AR 1263 (Jeff Dolven). "[A]ll of the major functional components of this project Skookum has past performance in." AR 2515.

[14] During oral argument, SA-TECH confirmed that it was willing to
(continued...)

do not outweigh the harm to plaintiff and to the equally important public interest in the proper application of the JWOD Act.

CONCLUSION

Plaintiff's motion for judgment on the administrative record is granted. Defendant's motion for judgment on the administrative record is denied. Defendant is enjoined from placing the YTC contract on the AbilityOne Procurement List and from contracting with Skookum for the work. The Clerk is directed to enter judgment for plaintiff accordingly. Costs to plaintiff.

s/Eric G. Bruggink
ERIC G. BRUGGINK

Judge

---

[14](...continued)
continue on an interim basis.